IN THE UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | | |
|---|---|---|
| **WESTON D. MCARTOR** | : | Case No.: _____ |
| 5100 East Cloud Road | : | |
| Cave Creek, Arizona 85331 | : | |
| | : | Judge _____ |
| and | : | |
| | : | |
| **BEI SERVICES, INC.** | : | **Complaint** |
| P.O. Box 2407 | : | |
| Cody, Wyoming 82414 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **VALSOFT CORPORATION INC.** | : | |
| 7405 TransCanada, Suite 100 | : | |
| Montreal, Quebec H4T IZ2 Canada | : | |
| | : | |
| and | : | |
| | : | |
| **ASPIRE USA LLC dba ASPIRE** | : | |
| **SOFTWARE** | : | |
| 251 Little Falls Drive | : | |
| Wilmington, Delaware 19808 | : | |
| | : | |
| Defendants. | : | |

1.      Plaintiffs Weston D. McArtor ("McArtor") and BEI Services, Inc. ("BEI Services") (collectively, "Plaintiffs"), bring this civil action in contract and tort pursuant to the laws of the state of Wyoming to remedy the misconduct of Defendants Valsoft Corporation Inc. ("Valsoft") and Aspire USA, LLC dba Aspire Software ("Aspire") (collectively, "Buyers" or Defendants"), which involves claims for breach of contract, promissory estoppel, fraud, civil conspiracy, and negligent misrepresentation arising out of and related to a certain asset purchase agreement and

consulting agreement that resulted, and continues to result, in financial damage to Plaintiffs and emotional distress to McArtor individually.   Plaintiffs seek a trial on all claims as well as compensatory damages, tort damages, punitive damages, attorney's fees, costs and expenses.

### Parties

2.      Plaintiff McArtor is a resident of Arizona, has transacted business in Wyoming and submits himself to the jurisdiction of the Court.

3.      Plaintiff BEI Services is a Wyoming corporation with a mailing address at P.O. Box 2407, Cody, Wyoming 82414.

4.      McArtor and Bud Karakey ("Karakey") are the current owners of BEI Services.

5.      Plaintiff McArtor is the current majority owner of BEI Services, and founder and former President of BEI Services, Inc. dba NEXERA ("Seller"), while Karakey is the former Vice-President of Seller.

6.      Seller was engaged, directly or indirectly, in the business of developing and providing data analytics software for performance measurement and benchmarking of service operations including, but not limited to, the printing industry (the "Business").

7.      Valsoft is a foreign corporation organized under the laws of Canada, authorized to transact business in the United States and Wyoming, and at all times relevant to this action, upon information and belief, transacted business in the United States from offices located in Canada at 7405 TransCanada, Suite 100, Montreal, Quebec H4T IZ2 Canada.

8.      According to its website, Valsoft specializes in the "acquisition and development of software companies in vertical markets."

9.      Aspire is a foreign limited liability company organized under the laws of Delaware, authorized to transact business in the United States and Wyoming, and at all times relevant to this

action, upon information and belief, transacted business from offices located in Delaware at 251 Little Falls Drive, Wilmington, Delaware 19808.

10.     Upon information and belief, Aspire is a division of Valsoft Corporation, and operates and manages Valsoft's global portfolio of wholly owned software companies.

11.     Upon information and belief, and at all relevant times to the allegations herein, Defendants continuously had (and continue to have) regular contacts with the United States and the state of Wyoming through its various companies and by doing business within and through the state of Wyoming's borders.

## Jurisdiction and Venue

12.     Plaintiffs McArtor and BEI Services and Defendants Valsoft and Aspire (collectively, the "Parties") are subject to the jurisdiction of this Court and venue is proper in this Court pursuant to 28 U.S.C. 1391, because Plaintiffs and Defendants were parties to an Asset Purchase Agreement ("APA"), attached hereto as **Exhibit A**, which requires "[a]ny legal or equitable action that arises out of or in connection with (directly or indirectly) [the APA] or the transactions contemplated [in the APA] shall be brought in any federal or state court located within the State of Wyoming[,]" and because a substantial part of the events or omissions giving rise to these claims occurred in the state of Wyoming and this district, specifically the promises made by Defendants to McArtor to acquire the Business that is the subject of the APA and is otherwise at issue in the herein lawsuit were made in the state of Wyoming and this district; Defendants' regular interactions with McArtor in his corporate capacity occurred in the state of Wyoming and in this district; and the brunt of the harm to Plaintiffs is felt by them in the state of Wyoming and in this district. Personal jurisdiction may be exercised by this Court over both Defendants in this district

because Defendants regularly had contacts with this district and is a party to that APA with a state of Wyoming forum-selection clause.

13.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. 1332 as there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00.

### Factual Background

14.     McArtor, who is 66 years old, began working in the managed print industry after serving in the U.S. Marines. He then co-founded the Business in 1993, and successfully served as President of the Business until 2023.

15.     The Business was a leader for decades in the office automation industry, providing customers with the most accurate comparative copier/printer device data and benchmarks.

16.     McArtor has more than 30 years of experience in the data analytics and benchmarking industry including, but not limited to, the printing industry.

17.     In 2022, after almost 30 years of operating the Business, McArtor began an extensive search to find a buyer to purchase and continue the Business' operations.

18.     McArtor discovered Valsoft after reading about Valsoft's acquisition of Italy-based MPS Monitor, a leading developer and provider of Remote Monitoring and Management (RMM) and Managed Print Services SaaS solutions for the print industry.

19.     With the assistance of Gerry Hodapp ("Hodapp") and Matthias Grossmann ("Grossmann"), both experienced and sophisticated consultants, Plaintiffs and Defendants initiated discussions wherein Defendants would purchase the Business, retain the employees and continue its operations.

20.     During these discussions in December 2022, McArtor told Defendants' Ray Mancini and Joe Farruggia that he, Karakey and the other employees of the Business needed to remain employed with the Business and that McArtor and Karakey specifically had to retain operational control of the Business post-acquisition.

21.     Karakey is 60 years old.

22.     During these discussions in December 2022, Defendants' Ray Mancini and Joe Farruggia assured McArtor that he and Karakey would remain in their respective positions and retain operational control of the Business post-acquisition.

23.     On January 9, 2023, McArtor, in his corporate capacity, and Valsoft executed and entered into a Letter of Intent ("First LOI"), which contemplated a $6,500,000 purchase price at the closing without any contingent payments or earnout payments. The First LOI is attached hereto as **Exhibit B**.

24.     Based on Valsoft's execution of the First LOI, and McArtor's reasonable belief that Valsoft was negotiating in good faith, McArtor granted Valsoft full access to the BEI Services' virtual data room and provided Valsoft with any additional information it requested.

25.     BEI Services' virtual data room contained most, if not all, of its confidential trade information, software and intellectual property, including its proprietary tech stack, all of which far exceeded Defendants' technology.

26.     Upon information and belief, Defendants primary interest in the Business was its technology and contacts, which they needed in order to gain entry into the U.S. market to sell their newly-acquired MPS Monitor.

27.     In February 2023, McArtor was diagnosed with an aggressive form of brain cancer.

28.     In February 2023, McArtor disclosed his brain cancer diagnosis to Defendants.

29.     Upon receiving notice of McArtor's brain cancer diagnosis, and having since accessed the Business' virtual data room and familiarizing themselves with the Business' superior software and technology relative to their own, Defendants' Ray Mancini and Joe Farruggia resumed discussions with McArtor, Hodapp and Grossmann.

30.     In conversations with McArtor, Hodapp and Grossmann in late February/early March 2023, Defendants' Ray Mancini and Joe Farruggia continued to assure McArtor, Hodapp and Grossmann that McArtor and Karakey would retain their respective positions and operational control of the Business post-acquisition.

31.     Defendants' assurances to Plaintiffs in late February/early March 2023 were especially critical given that McArtor was relying upon and using his employer-provided health insurance at that time to help defray the rising costs associated with his radiation and chemotherapy treatments.

32.     Defendants, however, wanted to revise the structure of the purchase price by reducing the amount paid at closing to $3,500,000 with contingent payments and earnout payments based on the Business' financial performance during the first, second and third anniversaries of the Closing.

33.     McArtor, Hodapp and Grossmann were agreeable to this revision to the purchase structure, in large part, because of Defendants' Ray Mancini's and Joe Farruggia's assurances that McArtor and Karakey would retain their respective positions and operational control of the Business post-acquisition.

34.     In late February/early March 2023, McArtor was confident the Business would meet or exceed the benchmarks set to qualify for the contingent payments and earnout payments as discussed between the Parties.

35.    On March 9, 2023, McArtor, in his corporate capacity, and Valsoft executed and entered into a revised Letter of Intent ("Second LOI"), which contemplated a $3,500,000 payment at the closing with entitlement to contingent payments and earnout payments based on the Business' financial performance on the first, second and third anniversaries of the Closing.  The Second LOI is attached hereto as **Exhibit C**.

36.    Section 14 of the Second LOI states: "Each of the Parties will act honestly, diligently, and in good faith in their respective endeavors to negotiate, settle and execute the Purchase Agreement by the Closing[.]"

37.    Section 17 of the Second LOI states: "This Letter of Intent … shall create a binding and enforceable agreement … with respect to … paragraph … 14 (Good Faith Negotiation)."

38.    Plaintiffs relied on Valsoft's assurances in the Second LOI to act honestly and in good faith when negotiating the purchase of the Business, and had no reason to believe Valsoft was not acting honestly and in good faith when McArtor executed the Second LOI.

39.    McArtor could have declined the Second LOI, terminated discussions with Defendants, and initiated discussions with other prospective buyers who expressed an interest in acquiring the Business, including, but not limited to, ECI Solutions.

40.    Instead, McArtor continued discussions with Defendants in reliance upon Defendants' Joe Farruggia's and Nicolas El Saddi's promises that McArtor would retain his employment and keep his salary and employer-provided health insurance for his cancer treatments when he executed the Second LOI.

41.    In fact, when McArtor signed the Second LOI and continued discussions with Defendants, McArtor informed Defendants' Joe Farruggia and Nicolas El Saddi that his

willingness to close on the contemplated sale was conditioned on him retaining his position as President and Karakey retaining his position as Vice-President.

42.      Based on discussions with Defendants' Joe Farruggia and Nicolas El Saddi before and after execution of the Second LOI, the Parties contemplated McArtor retaining his position as President for the purpose of promoting and executing product strategy and development in order for the Business to enter different verticals, Karakey retaining his position as Vice-President to maintain important customer and employee relations, and Defendants developing a sales force to expand the Business including for the benefit of MPS Monitor.

43.      The Second LOI contemplated a closing on or before March 31, 2023, which was then delayed and rescheduled for April 2023.

44.      During this time, McArtor's cancer treatments intensified and his health and prognosis continued to decline.

45.      During this time, upon information and belief, Defendants knew that McArtor's health and prognosis were continuing to decline.

46.      Shortly before the Closing in May 2023, Defendants sought to make a last-minute revision to the structure of the contemplated acquisition, and advised McArtor and Hodapp that the deal could not go forward with McArtor retaining his position as President of the Business due to the expense.

47.      McArtor and Hodapp advised Defendants that they would consider this last-minute revision as long as Karakey retained his position as Vice-President of the Business.

48.      In order to induce McArtor to forgo his salary and employer-provided health insurance, the latter of which he desperately needed for his cancer treatments, and agree to the revised deal, Defendants promised that Karakey would remain Vice-President, and showed

McArtor a draft powerpoint presentation showing Karakey as the "Operations Director" for the Business ("Townhall Presentation"). A copy of the Townhall Presentation is attached hereto as **Exhibit D**.

49.   In order to induce McArtor to forgo his salary and employer-provided health insurance, the latter of which he desperately needed for his cancer treatments, and agree to the revised deal, Defendants assured McArtor that he would continue with the Business as a consultant for a minimum six-month term receiving $25,000 upon signing, $25,000 on July 1, 2023, and $25,000 on September 1, 2023.

50.   Defendants assured McArtor that he would have the option to renew the Consulting Agreement for another six-month term with no limit on the amount of times the Consulting Agreement could be renewed.

51.   Defendants assured McArtor this was their standard practice with owners of businesses that Defendants had acquired in the past.

52.   McArtor was reluctant to agree but believed the transaction as contemplated was still a good deal for the Business and its employees, even if it was not in his best interest personally, because of Defendants' assurances that Karakey would remain Vice-President of the Business, and because the rest of his team was remaining intact and would receive new and better employment agreements from Defendants post-acquisition.

53.   Plus, McArtor knew the Business would still reach the benchmarks set to qualify for the contingent payments and earnout payments as long as he and Karakey retained operational control of the Business, especially since he himself would still direct new product strategy and development as a consultant for the Business through BEI Services post-acquisition.

54.     In or around late April 2023, Defendants presented Plaintiffs with a copy of the APA.

55.     Defendants knew that McArtor would only agree to the revised structure of the deal as set forth in the APA if he and Karakey retained operational control of the Business post-acquisition.

56.     In assessing the economic value of the revised structure of the deal as set forth in the APA, McArtor relied on Defendants' assurances that he would remain as a consultant for a minimum six month term, with the option of unlimited renewals, and that Karakey would remain Vice-President.

57.     In reliance upon Defendants' assurances, McArtor agreed to give up his salary and employer-provided health insurance and accept the revised deal under the APA.

58.     These assurances and others Defendants made to Plaintiffs as detailed herein were knowingly false and material statements or statements made with reckless disregard as to the truth or falsity of the statements.

59.     Defendants knowingly made these and other false representations of material fact in order to induce McArtor to forgo his employment, his salary and employer-provided health insurance, agree to the reduced purchase price at closing, sign the APA and to disguise their actions. Defendants knew that when they fraudulently induced McArtor to give up his salary and health insurance and accept the consulting position that they were never going to permit McArtor and Karakey to retain control of the Business, keep him as a consultant, pay him the full $75,000, keep Karakey as Vice-President, or give the Business a realistic opportunity to reach the benchmarks entitling Plaintiffs to the contingent payments and/or earnout payments as contemplated by the APA.

60.     McArtor, individually and in his corporate capacity, would not have executed and entered into the APA had he known that Defendants had no intention of permitting he and Karakey to continue operating and controlling the Business post-acquisition.

61.     The Parties executed and entered into the APA on May 3, 2023, with an effective date of May 1, 2023.

62.     Aspire and McArtor, on behalf of BEI Services, executed and entered into a Consulting Agreement on May 3, 2023, with an effective date of May 1, 2023, which is attached hereto as **Exhibit E**.

63.     After the Closing, on or about May 8 and 9, 2023, Defendants' leadership arranged for all former BEI Services officers and employees to be flown out to meet with them in Scottsdale, Arizona at the Valley Ho Hotel ("Onboarding Meeting").

64.     Karakey, BEI Services' Chief Technology Officer Matthew Peters ("Peters"), BEI Services' Chief Financial Officer Bethany Sondeno ("Sondeno"), and others attended presentations from Defendants, participated in question-and-answer sessions with Defendants, and met with Defendants' leadership one-on-one at the Onboarding Meeting.

65.     Defendants presented a revised version of the Townhall Presentation at the Onboarding Meeting, which substituted "TBD" for Karakey's name as "Operations Director" for the Business.

66.     Peters and Sondeno were the only former BEI Services employees to receive large suites from Defendants for the Onboarding Meeting.

67.     Upon information and belief, Defendants paid for large suites for Peters and Sondeno only in order to encourage their loyalty to them and because Defendants had already

decided in secret that it was going to terminate McArtor, Karakey and other former BEI Services employees.

68.    Defendants never intended to retain BEI Services as a consultant.

69.    Defendants never intended to retain Karakey as Vice-President.

70.    Defendants never intended to permit McArtor and Karakey to retain operational control of the Business.

71.    Both McArtor's and Karakey's performances as a consultant to and Vice-President of the Business, respectively, post-closing were satisfactory.

72.    Three days later, on May 11, 2023, Defendants terminated McArtor as a consultant to the Business and Karakey as Vice-President of the Business.  McArtor's and Karakey's terminations were not for cause or for poor work performance.  McArtor's and Karakey's terminations were for reasons other than for cause or poor work performance.

73.    After Defendants terminated McArtor without cause or for poor work performance, Defendants' Vice-President and Managing Director, Jeffrey Messud, verbally acknowledged to McArtor that he was owed the full $75,000 due under the Consulting Agreement.

74.    However, rather than allow McArtor to collect his $75,000 from Defendants, a viable multi-million dollar enterprise that could easily afford to pay McArtor $75,000, which could have gone toward defraying some of the rising costs for his cancer treatments, Defendants refused to pay the $75,000.

75.    McArtor and Karakey were the only individuals within the Business who knew its internal operations, its employees, and its clients, and who had the skills to secure additional clients.

76.     At the time of McArtor's and Karakey's respective terminations, Sondeno and Peters controlled the Business, and neither had any experience running the day-to-day operations of the Business or dealing with any of the Business' clients.

77.     Moreover, upon information and belief, Defendants have since moved Sondeno out of a leadership role within the Business to a corporate position elsewhere within their vast empire.

78.     To make matters worse, Defendants have reduced the development team of the Business from three developers and Peters to only one developer and Peters.

79.     Since purchasing the Business, Defendants terminated Guy Worzel ("Worzel"), a data analyst and consultant for almost nineteen years for the Business, who is 62 years old. Worzel had been assigned approximately 30 percent of the Business' customer base and had very long relationships with them. This action reduced the analyst consulting team by 25 percent, forcing the other analysts to absorb Worzel's clients and relationships.

80.     Since purchasing the Business, Defendants also terminated Tami Denham and Linda Grabowy and transferred their respective responsibilities to Dondra Bott, who upon information and belief has also absorbed all of Sondeno's responsibilities as the Chief Financial Officer.

81.     Since purchasing the assets of the Business, Defendants have also raised prices and introduced new fees.

82.     Since purchasing the Business, Defendants have raised prices to existing clients from anywhere between 5 percent and 15 percent and implemented a 1.6 percent processing fee on all transactions, which has caused a number of clients to leave.

83.     Section 4.4 of the APA provides that, "[f]ollowing the Closing and continuing through the Third Anniversary Date, Purchaser shall … not take any action which would likely have a Material Adverse Effect in the Business or the ARR[.]"[1]

84.     The APA defines Material Adverse Effect as:

"any change, event, occurrence, fact, circumstance, condition or development that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (i) the operations or condition (financial or otherwise) of the Business (including the Acquired Assets), taken as a whole, (ii) the ability of the Seller to consummate the transactions contemplated by this Agreement on a timely basis, or (iii) the ability of the Purchasers to operate the Business immediately after the Closing in a similar manner as that conducted by the Seller immediately prior to the Closing[.]"

85.     By its actions detailed herein, Defendants cut off the head of the Business' operations and fatally impaired the Business' ability to qualify for the contingent payments and earnout payments pursuant to the APA.

86.     Rather than retain McArtor's and Karakey's positions, and give the Business a fair opportunity to reach the contingent payment and earnout payment milestones in the APA, Defendants engaged in a fraudulent conspiracy.  The fraudulent conspiracy included fraudulently

---

[1] "ARR" means the sum of annual recurring revenues of the trailing-twelve months as of a given reference date, minus any discounts, and includes SaaS revenues from current products as listed on Exhibit F [to the APA], which may be amended from time to time upon mutual agreement between the Parties) and the allocable SaaS revenue portion of revenue generated from the Business' other products currently under development or developed in the future by the Business (e.g. the financial module and the sales module).  For further clarity, ARR shall also include SaaS revenues generated from sales of the Business' products (including Customer Offerings and products developed in the three (3) years following the Effective Date (the "Earnout Period")) to customers of Purchasers' Affiliates.  For further clarity, all the SaaS revenue generated from the sale of the Business' products to customers of Purchaser and the Purchasers' Affiliates shall be calculated and credited 100% in the ARR of the Business.  As for the SaaS revenues generated by sales of products Co-Developed with Purchasers' Affiliates, such revenues shall be calculated and counted as the Business' ARR at a portion to be determined and agreed to, in good faith, between the Parties.  ARR excludes any professional services revenue, consulting fees, product related services, managed services, miscellaneous fees, any and all price increases except as otherwise provided in Section 4.1(c)(iv) below, any non-recurring payments, revenue attributable to takeovers, acquisitions, mergers, or similar transactions. *See* APA, Definitions.

inducing McArtor to give up his salary and health insurance to become a consultant for the Business in the midst of undergoing expensive cancer treatments. Related thereto, Defendants promised McArtor that Karakey would remain Vice-President of the Business. Within days of Plaintiffs signing the APA and Consulting Agreement, Defendants terminated McArtor and Karakey, among others, and have fatally impaired the Business' ability to qualify for the contingent payments and earnout payments.

87.     Plaintiffs reasonably and detrimentally relied on Defendants' false representations of material fact and passed on the opportunity to consider other prospective buyers for the Business, like ECI Solutions, and/or continue to operate the Business and maintain his salary and health insurance.

88.     As a result of Defendants' fraud and fraudulent conspiracy, Plaintiffs have been financially damaged and McArtor has suffered emotional distress as he and his wife suddenly were thrown into a state of financial insecurity in the middle of their collective fight for his life against an aggressive and unforgiving illness.

89.     All of Defendants' conduct described in this Complaint was perpetrated intentionally, maliciously, and with the purpose of injuring Plaintiffs.

90.     Plaintiffs have not yet determined the full extent of the conduct or the injury caused thereby.

91.     Plaintiffs, through counsel, attempted to resolve the herein dispute out of court, to no avail ("Plaintiffs' Letter Seeking Relief"). A copy of Plaintiffs' Letter Seeking Relief is attached hereto as **Exhibit F**.

92.     Defendants' arrogant response to Plaintiffs' Letter Seeking Relief is attached hereto as **Exhibit G**.

**<u>Count 1:  Breach of Contract – the APA (BOTH Defendants)</u>**

93.     Plaintiffs incorporate by reference the preceding Paragraphs.

94.     On or about May 3, 2023, the Parties entered into the APA for the acquisition and sale of the Business.

95.     The APA included a valid offer and acceptance and was supported by adequate consideration.

96.     Defendants made the following promise to Plaintiffs in the APA: "Following the Closing, and continuing through the Third Anniversary Date, [Defendants] shall (i) not take any action which would likely have a Material Adverse Effect on Business or the ARR[.]"

97.     The APA states that "Material Adverse Effect" means "any change, event, occurrence, fact, circumstance, condition or development that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (i) the operations or condition (financial or otherwise) of the Business (including the Acquired Assets) taken as a whole, (ii) the ability of the Seller to consummate the transactions contemplated by this Agreement on a timely basis, or (iii) the ability of the Purchasers to operate the Business immediately after the Closing in a similar manner as that conducted by [Valsoft and Aspire] immediately prior to the Closing[.]"

98.     Approximately one week after the Closing, Defendants terminated McArtor.

99.     Approximately one week after the Closing, Defendants terminated Karakey.

100.    Approximately one week after the Closing, Defendants terminated Worzel.

101.    After the Closing, upon information and belief, Defendants transferred Sondeno, the Chief Financial Officer.

102.   After the Closing, Defendants terminated Tami Denham and Linda Grabowy and transferred each of their respective responsibilities to Dondra Bott, who will also absorb all of Sondeno's responsibilities as the former Chief Financial Officer.

103.   After the Closing, Defendants reduced the development team from three developers and Peters to one developer and Peters.

104.   After the Closing, Defendants raised prices to former BEI Services (and now current NEXERA) clients from anywhere between 5 percent and 15 percent and implemented a 1.6 percent processing fee on all transactions, which has caused a number of former BEI Services clients to leave.

105.   Defendants' decision to make these and other changes after the Closing constitutes a Material Adverse Effect on Business and the ARR and thus constitutes a breach of the APA.

106.   Defendants' breach of contract has damaged Plaintiffs, causing economic harm to McArtor and BEI Services and emotional harm to McArtor.

**Count 2:  Breach of Contract – the Consulting Agreement (Aspire only)**

107.   Plaintiffs incorporate by reference the preceding Paragraphs.

108.   On or about May 3, 2023, Plaintiff BEI Services and Defendant Aspire entered into a Consulting Agreement whereby BEI Services would provide consulting services to Aspire for the benefit of the Business.

109.   The Consulting Agreement included a valid offer and acceptance and was supported by adequate consideration.

110.   Defendant Aspire made the following promise to Plaintiff BEI Services: "This Agreement shall commence on [March 1, 2023] and shall continue for SIX (6) months (the "Initial Term"), unless otherwise terminated in accordance with Section 7 or terminated by Aspire by

providing a prior written notice of thirty (30) days to the Consultant. The parties acknowledge and agree that the Consultant shall be entitled to compensation until the expiration of such notice period. Upon expiration of the Initial Term, the parties may upon mutually agreeable terms extend the Initial Term for successive 6-month periods."

111.   The events of termination under Section 7 of the Consulting Agreement are limited to cessation of business and breach of the Consulting Agreement, neither of which occurred that would have authorized Defendant Aspire to terminate the Consulting Agreement.

112.   Defendant Aspire terminated the Consulting Agreement without reason and without giving Plaintiff BEI Services thirty day's written notice.

113.   The decision to terminate the Consulting Agreement without reason and without giving Plaintiff BEI Services thirty day's written notice constitutes a breach of contract.

114.   Defendant Aspire's breach of contract has damaged Plaintiff BEI Services as it failed to receive the $75,000 to which it is entitled under the Consulting Agreement, which has caused economic harm to BEI Services.

**Count 3: Breach of Contract or in the Alternative Promissory Estoppel (BOTH Defendants)**

115.   Plaintiffs incorporate by reference the preceding Paragraphs.

116.   In or around April 2023, Joe Farruggia, on behalf of one or both Defendants, promised Plaintiffs that if McArtor gave up his salary and employer-provided health insurance to become a consultant for a minimum six month term for the Business for $75,000, Defendants would execute the APA and he and Karakey would retain operational control of the Business post-acquisition (the "April 2023 Contract").

117.   The April 2023 Contract included a valid offer and acceptance and was supported by adequate consideration.

118.    Plaintiffs satisfied the terms of the April 2023 Contract by McArtor giving up his salary and employer-provided health insurance, signing the APA and Consulting Agreement and BEI Services working as a consultant for the Business and then was terminated, McArtor was stripped of the as-promised control (along with Karakey) of the Business and BEI Services did not receive the $75,000.

119.    Defendants breached the April 2023 Contract with Plaintiffs by terminating BEI Services as a consultant and Karakey from the Business, stripping McArtor and Karakey of the as-promised control of the Business, terminating the Consulting Agreement without reason and without giving BEI Services the contractually-required thirty days' notice.

120.    Defendants' breach of contract has damaged Plaintiffs economically as McArtor lost his salary and employer-provided health insurance, was stripped of the as-promised control (along with Karakey) of the Business and did not receive the $75,000 to which he was originally told he would receive by Defendants' Jeffrey Messud and was otherwise entitled.

121.    If the April 2023 Contract is found not to be a valid contract, Plaintiffs plead in the alternative the following claim for promissory estoppel.

122.    In or around April 2023, Joe Farruggia, on behalf of one or both Defendants, promised Plaintiffs that if McArtor gave up his salary and employer-provided health insurance to become a consultant for a minimum six month term for the Business for $75,000, Defendants would execute the APA and permit McArtor and Karakey to retain operational control of the business post-acquisition.   This promise was definite and neither vague nor ambiguous.

123.    McArtor gave up his salary and employer-provided health insurance, signed the APA and Consulting Agreement and worked as a consultant for the Business for the benefit of

Aspire and then was terminated, stripped of the as-promised operational control (along with Karakey) of the Business and did not receive the $75,000.

124.   Defendants should have reasonably expected that Plaintiffs would rely on the above promises and Plaintiffs did rely on the above promises to their detriment by McArtor foregoing his salary and employer-provided health insurance, and consideration of offers for the Business from other prospective buyers like ECI Solutions.

125.   Plaintiffs have been damaged and injustice can be avoided only by enforcing the April 2023 Contract and restoring McArtor, Karakey and others to their respective positions with the Business, or, in the alternative, ordering Defendants to pay Plaintiffs all of the contingent payments and earnout payments they would have received under the April 2023 Contract but for Defendants' breach, including the $75,000, because Plaintiffs forewent a valuable right.

### Count 4:  Declaration of Rights (BOTH Defendants)

126.   Plaintiffs incorporate by reference the preceding Paragraphs.

127.   Terminating McArtor, Karakey, and Worzel, transferring former Chief Financial Officer Sondeno, terminating Denham and Grabowy and transferring each of their respective responsibilities to Dondra Bott – who is also absorbing all of Sondeno's responsibilities as the former Chief Financial Officer, reducing the Business' development team from three developers and Peters to one developer and Peters, raising prices to former BEI Services clients and now current NEXERA clients from anywhere between 5 percent and 15 percent, and implementing a 1.6 percent processing fee on all transactions, which has caused a number of former BEI Services clients and now NEXERA clients to leave, all within a few months and in some cases a few days after the Closing, constitutes a Material Adverse Effect on Business or ARR pursuant to the terms of the APA.

128.   Plaintiffs request that the Court enter a declaratory judgment that one or more of the actions taken by Defendants as detailed herein constitute a Material Adverse Effect on the Business or ARR pursuant to the terms of the APA.

### Count 5:  Fraud (BOTH Defendants)

129.   Plaintiffs incorporate by reference the preceding Paragraphs.

130.   Joe Farruggia and Jeffrey Messud, on behalf of one or both Defendants, knowingly, and with the intent to deceive Plaintiffs, made false representations of material fact to Plaintiffs.

131.   Joe Farruggia's and Jeffrey Messud's misrepresentations to Plaintiffs, on behalf of one or both Defendants, were material.

132.   Joe Farruggia and Jeffrey Messud, on behalf of one or both Defendants, acted with scienter and with the specific intent to harm Plaintiffs.

133.   Through fraud, deception and misrepresentation, and a ruthless desire to take advantage of a sick man who while fighting for his life was also trying to do right by his beloved company and employees, Defendants intended to induce Plaintiffs to rely on their false statements of material fact and induce McArtor to forego his salary and employer-provided health insurance and the opportunity to consider offers to purchase the Business from other prospective buyers like ECI Solutions and to execute the APA and Consulting Agreement.

134.   Plaintiffs justifiably relied on the false representations of Joe Farruggia and Nicolas El Saddi made in or around April 2023, on behalf of one or both Defendants, that McArtor and Karakey would retain operational control of the Business post-acquisition and McArtor resigned his employment and was damaged as he gave up his salary and employer-provided health insurance; damaged because he and Karakey no longer control the Business; damaged because the Business no longer has adequate, qualified staff in place to grow and reach the benchmarks

entitling Plaintiffs to contingent payments and earnout payments under the APA; damaged because Plaintiffs could have considered offers from other prospective buyers who would have negotiated in good faith; and damaged because BEI Services did not receive the $75,000.

135.    McArtor would not have resigned his employment with BEI Services in or around May 2023 and given up his salary and employer-provided health insurance but for Jeffrey Messud's and Nicolas El Saddi's false statements, on behalf of one or both Defendants, that McArtor and Karakey would retain control of the Business as a consultant and Vice-President, respectively, if he resigned.

136.    Plaintiffs reasonably relied on Jeffrey Messud's and Nicolas El Saddi's false statements, on behalf of one or both Defendants, and were damaged because McArtor gave up his employment, his salary and employer-provided health insurance, and gave up consideration of offers to purchase the Business from other prospective buyers.

137.    As a result of Jeffrey Messud's and Nicolas El Saddi's false representations to Plaintiffs, on behalf of one or both Defendants, Plaintiffs detrimentally relied on Defendants and have suffered harm and sustained damages in an amount to be determined by the Court.

## Count 6:  Civil Conspiracy (BOTH Defendants)

138.    Plaintiffs incorporate by reference the preceding Paragraphs.

139.    Defendants acted in concert to defraud Plaintiffs.

140.    Defendants' concerted tortious conduct caused Plaintiffs to suffer damages and have to incur attorney's fees and expenses to collect the damages owed.

141.    As a member of the conspiracy, both Defendants are jointly and severally liable for the damages caused by the tortious conduct of each participant of the conspiracy.

**Count 7:  Negligent Misrepresentation (BOTH Defendants)**

142.   Plaintiffs incorporate by reference the preceding Paragraphs.

143.   In the alternative to Plaintiffs' fraud and civil conspiracy claims in Counts 4 and 5, Plaintiffs assert a negligent misrepresentation claim against Defendants.

144.   Defendants, through Joe Farruggia, Jeffrey Messud and El Saddi, in their respective corporate capacities, negligently supplied false information to Plaintiffs, including, but not limited to, false assurances in or around April 2023 that McArtor and Karakey would retain control of the Business as a consultant and Vice-President, respectively, if McArtor resigned his employment and gave up his salary and health insurance, and forewent the opportunity to consider offers from other prospective buyers for the Business like ECI Solutions.

145.   McArtor, in his individual and corporate capacities, reasonably relied upon such false information in resigning from the Business in May 2023 and entering into and executing the APA and Consulting Agreement.

146.   McArtor, in his individual and corporate capacities, has suffered economic injury proximately resulting from relying on false information supplied by Defendants by giving up his salary and employer-provided health insurance, foregoing the opportunity to consider offers for the Business from other prospective buyers, and having no choice but to file the herein lawsuit while fighting cancer and suffering through multiple brain surgeries to regain his (and Karakey's) position rightfully owed because Defendants' Jeffrey Messud terminated McArtor and Karakey and refused to pay BEI Services the $75,000 despite promising to do so.

**Count 8:  Attorney's Fees (BOTH Defendants)**

147.   Plaintiffs incorporate by reference the preceding Paragraphs.

148.   The APA provides that Plaintiffs are entitled to have their reasonable attorney's fees, costs and expenses paid by Defendants for the flagrant breach of contracts that required Plaintiffs to take this legal action to enforce the APA.

149.   Defendants are also liable for Plaintiffs' reasonable attorney's fees, costs and expenses owed pursuant to the APA as a result of the fraud and fraudulent conspiracy orchestrated by Defendants.

150.   Accordingly, Plaintiffs, having brought the herein lawsuit to enforce the APA and the evidence showing the terminations of valuable, critical employees, egregious price increases to customers, and payments promised, owed and not made pursuant to the Consulting Agreement, Plaintiffs are entitled to recover their attorney's fees, costs and expenses from Defendants per the terms of the APA.

### Count 9: Punitive Damages (BOTH Defendants)

151.   Plaintiffs incorporate by reference the preceding paragraphs.

152.   Plaintiffs are entitled to recover punitive damages from Defendants, jointly and severally, because Defendants have engaged in willful misconduct, malice, fraud, wantonness, oppression, and through such conduct demonstrated a lack of care and decency towards a person fighting cancer, as to raise the presumption that Defendants acted with conscious indifference to the consequences of their actions.

### Prayer for Relief

WHEREFORE, Plaintiffs Weston D. McArtor and BEI Services, Inc., pray for judgment as follows:

a.      that judgment be entered in favor of Plaintiffs and against Defendants on each and every count herein;

b.      that Defendants' actions directed at Plaintiffs after the Closing, as detailed above, be declared a Material Adverse Effect on the Business or ARR pursuant to the APA;

b.      that Defendants be held jointly and severally liable to Plaintiffs for fraud and the fraudulent conspiracy;

c.      that if Defendants are not held liable for fraud, that they in the alternative be held jointly and severally liable for negligent misrepresentation;

d.      that Plaintiffs be awarded full compensatory damages, breach of contract damages or in the alternative promissory estoppel damages, punitive damages, and attorney's fees, costs and expenses; and

e.      that the Court award such other and further relief as the Court deems just and proper.

Dated: August 1, 2023               Respectfully submitted,

<div style="margin-left:40%">

*/s/ Lance Shurtleff*
Lance Shurtleff
DINSMORE & SHOHL, LLP
1775 Sherman Street
Suite 2500
Denver, CO 80203
Telephone: 303-831-6988
Email: lance.shurtleff@dinsmore.com

Douglas J. Feichtner
DINSMORE & SHOHL, LLP
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202
Telephone: 513-977-8200
Email: doug.feichtner@dinsmore.com
*Pro hac vice to be submitted*

*Attorneys for Plaintiffs*

</div>